State of Connecticut *v.* Rick A. Miner
(11733)

Peters, C. J., Healey, Dannehy, Santaniello and Callahan, Js.

Argued June 5—decision released September 3, 1985

*Monte P. Radler,* special public defender, for the appellant (defendant).

*John F. Cocheo,* assistant state's attorney, with whom, on the brief, was *C. Robert Satti,* state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Rick A. Miner, was convicted by a jury of first degree sexual assault, in violation of General Statutes § 53a-70,[1] and of unlawful restraint in the first degree, in violation of General Statutes § 53a-95.[2] He was sentenced to an effective

---

[1] "[General Statutes] Sec. 53a-70. SEXUAL ASSAULT IN THE FIRST DEGREE: CLASS B FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person.

"(b) Sexual assault in the first degree is a class B felony for which one year of the sentence imposed may not be suspended or reduced by the court."

[2] "[General Statutes] Sec. 53a-95. UNLAWFUL RESTRAINT IN THE FIRST DEGREE: CLASS D FELONY. (a) A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose the latter to a substantial risk of physical injury.

"(b) Unlawful restraint in the first degree is a class D felony."

term of eighteen years, suspended after fifteen years, and five years probation. The defendant appeals from the judgment of conviction claiming that (1) the state's failure to make a timely disclosure of allegedly exculpatory identification information deprived him of his constitutional rights to due process and a fair trial, and (2) his trial counsel's failure to seek sanctions or pursue further investigation upon the untimely disclosure of this information denied him the effective assistance of counsel. We find no error.

From the evidence adduced at trial, the jury could reasonably have found the following facts: On the evening of April 17, 1982, the complainant and her husband went to Danny's Cafe in Niantic, where they played pool with some friends and other customers, including the defendant. The complainant and her husband left the cafe at about 1:30 a.m. and went to the Lyme Tavern. About an hour later, after an argument with her husband, the complainant left the tavern to walk home alone. The tavern was approximately one mile from where she lived.

While walking along route 156, the complainant saw the defendant standing in a lighted parking lot. Minutes later, she saw him hitch a ride from a passing car. As the complainant approached the intersection of route 156 and Fairhaven Road, she again observed the defendant. He approached her on foot and, after a brief conversation in which the defendant expressed his desire for her and the complainant warned him to leave her alone, he pulled her into the bushes alongside the road. There was a struggle, during which the defendant overpowered the complainant, throwing her to the ground and sexually assaulting her.

The complainant eventually broke free and ran away, naked from the waist down. She ran up Fairhaven Road to a lighted house nearby. She told the occupants of

the house that she had been raped and they took her in, gave her aid and called the police. Meanwhile, two of the men who were at the house, Robert Llewellen and James Suprenant, proceeded to the area where the complainant said the rape had occurred. In the illumination of a street light, Llewellen observed a man, clad only in his shirt and underwear, running from the spot the complainant had identified as the scene of the assault. Although Llewellen was able to see the man's face clearly, Suprenant was looking in a different direction and caught only a quick glimpse of the running man. Suprenant and Llewellen chased the man but were unable to catch him.

Both Llewellen and Suprenant testified at trial. Llewellen made a positive in-court identification of the defendant as a man he had seen earlier that evening at Danny's Cafe, and as the individual he had observed running from the scene of the crime. Suprenant, who had also been at Danny's Cafe earlier that night, could not identify the defendant at trial.

The complainant made an unequivocal in-court identification of the defendant at trial. Later during the course of the state's direct examination of the complainant, the state's attorney began to question her regarding a photographic identification session conducted by the police several days after the assault. Defense counsel objected and asked that the jury be excused.

In the jury's absence, the defendant's attorney conducted a voir dire examination of the complainant. The witness testified that she had been shown the photographs two days after the assault, which occurred on April 18, 1982, whereupon defense counsel stated: "I'm going to object to any inquiry as to any photographic display made after the 19th" on the ground "that counsel was appointed for the Defendant . . . on

April 19th . . . and any photographic confrontation without the assistance of counsel would be in violation of his sixth amendment and fourth amendment rights.'' Before the court had an opportunity to rule on the defendant's objection, the state's attorney interjected that he had ''an ethical and professional duty to vouch for his witnesses . . . [and] on that basis . . . I have an obligation to inquire regarding the prior photo lineup which is, in fact, flawed. . . . She made a misidentification, Your Honor.'' At that point, defense counsel withdrew his objection and the court declared a short recess.

After the recess, the jury returned to the courtroom and the state's attorney resumed his direct examination of the complainant regarding the photographic lineup. She testified that the police had visited her home and showed her a display of about ten photographs. After viewing the display, she informed the police that she ''really could not identify the person in the pictures.'' Although she picked out ''two that looked similar,'' she told the police that ''I could not pick out one certain one because I was not sure if that was the man, and I didn't want to point somebody out that was not the man who did this.'' The complainant further testified that she did not narrow her identification down to one picture, and that neither of the two photographs she selected was of the defendant, whose picture was in fact among those displayed. She explained her inability to recognize the defendant's photograph by saying ''it wasn't a very clear picture, and I would rather have seen him in person, and I just didn't want to pick somebody out if I wasn't really sure . . . but I know for a fact that [the defendant] is the man now because I see him in person, and I can just remember his face that night very clearly.'' Shortly thereafter, the state concluded its direct examination of the complainant.

On cross-examination, the defendant's trial counsel questioned the complainant regarding the photographic identification session. He offered the photographic display as a full evidentiary exhibit, and it was admitted without objection and passed among the jurors at counsel's request. During this portion of his cross-examination, the defendant's attorney attempted to impeach the complainant's in-court identification of the defendant by questioning her on her inability to recognize his photograph. He challenged her characterization of the defendant's picture as "foggy or unclear," and tried to cast doubt on her descriptive abilities and powers of perception by comparing her prior description of the defendant with the two photographs she had selected as looking most like her assailant.

On May 10, 1982, the defendant had filed a pretrial motion for discovery and inspection in which he requested exculpatory information or materials including "[n]egative, inconsistent, ambiguous, or exhonorating [sic] results obtained in a showup, lineup, or photographic identification procedure." In its answer to the defendant's motion for discovery, the state indicated that it had no knowledge of any such exculpatory information or materials. While the defendant does not allege prosecutorial misconduct and conceded in oral argument that there is no reason to believe that the state intentionally withheld information regarding the complainant's faulty photographic identification, he argues that "the manner and timing of the prosecution's disclosure was clearly negligent and severely prejudiced [him] in the preparation and presentation of his defense." He claims on appeal that the prosecutor's disclosure during trial of the complainant's flawed photographic identification, after eliciting her unequivocal in-court identification of the defendant, denied him his right to a fair trial.

The defendant argues that the state's tardy disclosure of the allegedly exculpatory identification information was in violation of his constitutional rights as established in *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), and codified in General Statutes § 54-86c.[3] To obtain a new trial on the basis of a claim of tardy disclosure, "the defendant bears the burden of proving that he was prejudiced by the state's failure to make the information available to him at an earlier time." *State* v. *Reddick,* 197 Conn. 115, 122, 496 A.2d 466 (1985). The defendant asserts that the timing of the disclosure was harmful in two respects. First, he maintains that the late discovery "foreclosed [him] from pretrial investigation and/or exploration of the evidence underlying [the complainant's] in-court identification and out-of-court misidentification." Such investigation, the defendant suggests, might have furnished a basis for the suppression of the complainant's in-court identification. The second source of prejudice claimed by the defendant is that "the timing of the disclosure denied [him] an opportunity to develop, through additional discovery or otherwise, a defense based upon mistaken identity." Prior knowledge of the complainant's misidentification, he argues, would have enabled trial counsel to investigate the two men whose photographs were selected during the identification session, and would possibly have led to information implicating someone other than the defendant as the assailant.

---

[3] Because the complainant's misidentification was disclosed during trial, that information cannot be considered "suppressed" within the meaning of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). *State* v. *Dolphin,* 195 Conn. 444, 455–56, 488 A.2d 812 (1985); *State* v. *Altrui,* 188 Conn. 161, 177, 448 A.2d 837 (1982). Under these circumstances, "the defendant can complain only of the timing of the disclosure and has no basis for a claim of suppression." *State* v. *Reddick,* 197 Conn. 115, 121, 496 A.2d 466 (1985).

We are unable to address on its merits the defendant's claim of prejudicial tardy disclosure of exculpatory material because it has not been properly preserved for appellate review both because of the defendant's withdrawal of his objection at trial and because of the inadequacy of the record. When the state first began to question the complainant regarding the photographic identification session, defense counsel initially objected to the inquiry, but, upon learning that the identification was "flawed," immediately withdrew the objection. The defendant raised no claim of "suppression" of exculpatory information at trial, nor did he move the court for a continuance or for other relief. There was no request for a suppression hearing to determine whether or not the identification procedure was unnecessarily suggestive; see *State* v. *Gordon,* 185 Conn. 402, 413, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982); or to test the reliability of the complainant's in-court identification. Id., 418. Although on appeal the defendant asserts that investigation of the two men whose photographs were selected by the complainant might have yielded a successful defense based upon mistaken identity, he has presented nothing to indicate that either these two individuals or any other person besides the defendant was in any way connected with the charged offense. Compare *Grant* v. *Alldredge,* 498 F.2d 376 (2d Cir. 1974). On this record, the defendant's claims of prejudice are purely speculative and cannot furnish a basis for the reversal of his conviction.

In *State* v. *Altrui,* 188 Conn. 161, 448 A.2d 837 (1982), we declined to consider a similar claim of untimely disclosure due to the defendants' failure to raise the issue at trial. "Whether acting wittingly or unwittingly defendants cannot decline to avail themselves of appropriate procedural motions at the trial at a time when curative action may be taken and then

expect this court to afford them relief on appeal without making a clear showing of a denial of a fundamental constitutional right, in this case that the delay in disclosure deprived them of a fair trial." Id., 178. In this case, the defendant not only withdrew an objection to the complainant's direct testimony regarding the photographic identification session, but he used this information to his own advantage in cross-examining the complainant. By choosing to proceed in this fashion at trial, the defendant effectively waived, for the purposes of appeal, any claim of error based on the state's late disclosure of exculpatory evidence. See *State* v. *Martin,* 197 Conn. 17, 24–25, 495 A.2d 1028 (1985). Although the defendant has cited *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973), in urging this court to review this claim, he has not presented a record that "adequately supports a claim that [he] has clearly been deprived of a fundamental constitutional right and a fair trial." Id., 70.

The defendant also claims that his trial attorney's failure to request a suppression hearing, or to move for "any of the applicable sanctions provided by [Practice Book § 747 for the state's failure to disclose information discoverable as of right under Practice Book § 740], including a . . . mistrial," constituted ineffective assistance of counsel.[4] "The test that measures ineffective assistance of counsel requires a defendant to make two showings, that trial counsel's performance was not

---

[4] "[Practice Book] Sec. 747. ——SANCTIONS FOR FAILURE TO COMPLY

"If the prosecuting authority fails to comply with Sec. 740, the judicial authority may, on motion of the defendant or on his own motion, grant appropriate relief, which may include one or more of the following:

"(1) Requiring the prosecuting authority to comply;

"(2) Granting the defendant additional time or a continuance;

"(3) Relieving the defendant from making a disclosure required by Sec. 756, prohibiting the prosecuting authority from introducing specified evidence, or dismissing the charges; or

"(4) Entering such other order as he deems proper."

reasonably competent or within the range of ordinary training and skill in the criminal law, and that trial counsel's lack of competence contributed to the defendant's conviction. [Citations omitted.] As we have repeatedly held, this test is difficult to meet on the face of an appellate record because such a record rarely reveals the strategic reasons behind the actions taken or not taken by trial counsel. For that reason, we have with increasing frequency declined to consider such claims on direct appeal, suggesting instead that their merits be addressed by recourse to habeas corpus. See, e.g., *State* v. *Lubesky,* 195 Conn. 475, 485, 488 A.2d 1239 (1985); *State* v. *Jacobowitz,* 194 Conn. 408, 413, 480 A.2d 557 (1984); *State* v. *Tirado,* [194 Conn. 89, 92–93, 478 A.2d 606 (1984)]." *State* v. *Rivera,* 196 Conn. 567, 570, 494 A.2d 570 (1985).

While the defendant recognizes this court's reluctance "to resolve this kind of claim upon a direct appeal rather than after a habeas corpus proceeding where facts and circumstances often not disclosed by a trial transcript can be fully developed and the lawyer who represented the defendant at trial can be heard from"; *State* v. *Orsini,* 187 Conn. 264, 280, 445 A.2d 887, cert. denied, 459 U.S. 861, 103 S. Ct. 136, 74 L. Ed. 2d 116 (1982); he submits that in this case "the 'facts and circumstances' are sufficiently clear from the record and trial transcript to warrant direct review." At oral argument, the defendant focused on his trial counsel's failure adequately to investigate the circumstances of the photographic identification procedure to determine the reliability of the complainant's in-court identification. He maintained that his attorney's failure to request a suppression hearing was inexcusable and he appeared to argue that this omission was prima facie evidence of ineffective assistance. We disagree.

Although on the record before us we can only speculate as to why trial counsel chose to cross-examine the

complainant with regard to her flawed photographic identification rather than to pursue other available options, we are able to conceive of several tactical reasons for proceeding as he did. For example, the defendant's attorney might have decided that a motion to suppress the complainant's in-court identification would be futile in light of her testimony that she had had several opportunities to view the defendant, both before the crime, at Danny's Cafe and in a lighted parking lot on route 156 as she was walking home, and during the attack. See *State* v. *Gordon,* supra, 415–16 (among the factors which determine the reliability of an identification is the opportunity of the witness to view the criminal at the time of the crime).

We are likewise unpersuaded that trial counsel's failure to seek a continuance to conduct further discovery compels a finding of inadequate representation. The complainant testified that she did not positively identify any of the photographs displayed as that of her assailant, but merely selected two pictures that she thought most closely resembled him. From this testimony trial counsel might well have concluded that an investigation aimed at inculpating another individual as the perpetrator would be fruitless. Such a conclusion would certainly have been reasonable given the positive identification of the defendant supplied by Robert Llewellen. On the appellate record presently before us, we cannot conclude that the defendant was denied adequate assistance of counsel.

There is no error.

In this opinion the other judges concurred.